*In re* WILLIAM MOORE.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* WILLIAM MOORE, Respondent-Appellant.)

First District (5th Division)   No. 77-925

Opinion filed August 18, 1978.

Ralph Ruebner and Kathy M. Morris, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Suzanne Philbrick, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Respondent was asserted to be in need of mental treatment by a petition filed by Deputy Robert Quinn of the Du Page County Sheriff Department and supported by two certificates of need for hospitalization filed by two licensed physicians. Following a jury trial conducted on March 9 and 10, 1977, respondent was found to be in need of mental treatment (Ill. Rev. Stat. 1975, ch. 91½, par. 1—11) and ordered to be hospitalized at Madden Mental Health Center. Subsequent to the filing of the notice of appeal, respondent was discharged from Madden. Although

respondent raises several issues on appeal, the only one necessary for our disposition is whether respondent, who insisted on appearing pro se, was apprised of the fact that his court-appointed advisor was a law student operating under a Supreme Court Rule 711 (Ill. Rev. Stat. 1975, ch. 110A, par. 711) license. We believe he was not so informed and therefore reverse the judgment of the circuit court.

The face of the transcript of the hearing held on February 15, 1977, reflects that Debora Michels, an assistant public defender and Michael Tinaglia, a 711 student, supervised by Michels, appeared on behalf of respondent. At this hearing, respondent indicated that he wished a jury trial. The date for the trial was set for March 9, 1977. The cover of the transcript discloses that at the proceedings on March 9-10, 1977, held before a different judge than the one presiding on February 15, 1977, Michael Tinaglia was in attendance. After his name the title "Assistant Public Defender" appears.

Prior to the commencement of trial, Tinaglia made a motion to withdraw as counsel because respondent wished to represent himself. In a discussion during which the judge indicated that respondent had the right to defend himself, he also told respondent that he should select one of the assistant public defenders present in the courtroom to second chair his trial. Respondent refused Michels and selected Tinaglia. Just before opening statements, the judge commented: "Over your apparent disatisfaction [sic], I have appointed a court advisor in the person of a Public Defender, who is a lawyer."

At trial, Robert Quinn testified for the State that as deputy to the sheriff of Du Page County he was responsible for the physical and mental well-being of the inmates of Du Page County Jail. At approximately 8:30 p.m. on February 8, 1977, he heard a commotion in the jail. He and another deputy responded to the noise and entered an area where he observed respondent standing over another inmate, and heard respondent threaten to kill the other man. Quinn ordered him into an isolation area and on the following day executed a petition for his transfer to Madden.

During cross-examination, Quinn admitted that he had heard inmates threaten to kill each other on other occasions. He signed the petition for hospitalization not only for the substance of respondent's statements but for the sense of urgency he perceived in his behavior. At the time of the confrontation there were eight to ten people in the cubicle.

Herschel Gulley testified that he had become friendly with respondent during the preceding four months because of a common interest they shared in prison reform. At approximately 1:15 a.m. on February 9, 1977, respondent telephoned him and said that he had a few ideas for their prison reform project. Gulley responded that they would discuss it in the morning, but respondent urged him to come to his home immediately.

Gulley arrived one-half hour later and respondent told him that he might need him as a witness. Respondent began pacing and stated that he had been in a very small cell. He then asked him if he believed in the Catholic church and Gulley answered that he had certain reservations.

Respondent told him "Get up, I want to teach you what it's like to be a man," and proceeded to grab him and slap him a few times. Respondent continued to yell and also spit at him and shake him. Respondent then backed away and said "I have been [e]mpowered in my mind to do with you as I feel. I'll tear off your skin." Gulley began praying and respondent told him that he'd send him to heaven. He then asked "How do you want it, with a gun?"

During cross-examination the witness admitted that he had mentioned the holy spirit to respondent and that he had had a dream where God had talked to him.

Bruce Collins testified that he had known respondent for 3½ years. On February 10, 1977, Collins telephoned respondent and volunteered to work on his car. Respondent declined the offer, but wanted to see him, and asked him to bring over a gallon of milk. Respondent also told him that he and his wife had had a quarrel. At 9:45 a.m. Collins went out and purchased the milk and proceeded to respondent's home. When he arrived, respondent asked him about his mother who is an alcoholic. Collins told him how much his mother was drinking and respondent stated that he should praise her. Collins then realized that something was wrong with Moore.

A short time later, respondent started cursing, and unjustly accused him of having sexual intercourse with his wife. Respondent then hit him in the mouth and told him to leave. Subsequently, Moore picked up the carton of milk and broke it over his head. Just before Collins left, respondent threw a cigarette lighter at him, but it missed.

During cross-examination, Collins testified that Moore had apologized to him since this incident. He also agreed that Moore had never tried to lead him into anything illegal. After a side bar during which the judge admonished him to limit his questions to those issues raised on direct, Moore repeated most of the questions posed during indirect examination.

Ronald Jane, a neighbor of respondent's for two years, testified that at approximately 2 p.m. on February 10, 1977, Moore knocked on his door. When Jane opened his door, Moore offered him a beer and invited himself in. He subsequently began accusing Jane of engaging in "bizarre sexual acts" with his wife and nine-year-old daughter. He then lunged at him and struck him in the face. Although Jane never actually saw a gun, respondent told him he had one, and made a motion as if to draw one. Jane's wife then entered the room and Jane threw respondent through the glass door, and called the police.

Subsequently, he observed respondent enter his own house and proceed to break every window within view. Respondent continued to scream obscenities and accusations at his neighbors for approximately one-half hour. He also tried to open other people's doors until the police arrived and arrested him. Moore was released on recognizance the next morning.

Mrs. Moore testified that she had been married to respondent for 14 years. In January 1974 he began taking medicine for a mental condition but had since stopped. Her husband had been voluntarily hospitalized on two previous occasions. During cross-examination, she stated that her husband told her that he had been given Thorazine medication while in the Federal prison system and that she knew that he had been in jail twice.

Dr. Yoso Del Kampo, a psychiatrist, testified that he had spoken to respondent for 30 minutes a day since February 10, 1977. In his opinion, respondent, a paranoid schizophrenic, was in need of mental treatment because of his potential for dangerousness to others.

When the doctor first met Moore, the latter was confused, incoherent and uncooperative. He was extremely preoccupied with religion. The doctor felt that respondent was suffering a delusional reaction and experiencing halucinations that he was receiving messages from God. Del Kampo indicated that this type of patient is dangerous because he believes he acts with the permission of God.

Although respondent had improved greatly over the weeks he had been in the hospital, Del Kampo was of the opinion that his prognosis was not good unless he received further treatment. After a few weeks time, the doctor expected to perhaps treat him on an out-patient basis. Although respondent was taking Thorazine and anti-anxiety medication, his paranoid condition might interfere with his ability to control himself. His religious fervor had diminished during the weeks he had spent in the hospital, although it was still more intense than usual.

During cross-examination, Del Kampo testified that if respondent were placed on outpatient care at the present moment, he would not be a threat to society. Respondent's chart was no longer marked "suicidal" and "homicidal" as it had been when he was first admitted. The doctor agreed with respondent that he had told him he could reduce the dosage of his medication if he were anxious about having side effects. Further, Moore was permitted to roam the grounds of the hospital, eat with regular utensils and wear street clothing. Del Kampo also stated that respondent had not been given a brain scan.

After the State rested and respondent's motion for a directed verdict, argued by Tinaglia, was denied, Robert Albert was called as a witness on behalf of respondent. He stated that respondent had been losing sleep and was trying to help a certain family. During cross-examination, Albert

stated that he saw respondent on February 5, 1977, and the latter was erratic and highly emotional. In his opinion, respondent was in need of mental treatment.

After calling Martha Marie Miller, a nurse from Madden who was only given the opportunity by respondent to state that she saw him five days a week, respondent rested.

After closing arguments and giving of instructions, the jury found respondent to be in need of mental treatment and the judge ordered him to be hospitalized at Madden.

OPINION

Supreme Court Rule 711 (Ill. Rev. Stat. 1975, ch. 110A, par. 711) provides in relevant part:

"(c) Services Permitted. Under the supervision of a member of the bar of this State, and *with the written consent of the person on whose behalf he is acting, which shall be filed in the case and brought to the attention of the judge* or presiding officer, an eligible law student may render the following services:

(1) He may counsel with clients, negotiate in the settlement of claims, and engage in the preparation and drafting of legal instruments.

(2) He may appear in the trial courts and administrative tribunals of this State, subject to the following qualifications:

(i) Appearances, pleadings, motions, and other documents to be filed with the court may be prepared by the student and may be signed by him with the accompanying designation "Senior Law Student" but must also be signed by the supervising member of the bar.

(ii) In criminal cases, in which the penalty may be imprisonment, in proceedings challenging sentences of imprisonment, and in civil or criminal contempt proceedings, the student may participate in pretrial, trial, and post-trial proceedings as an assistant of the supervising member of the bar, who shall be present and responsible for the conduct of the proceedings.

(iii) In all other civil and criminal cases the student may conduct all pretrial, trial, and post-trial proceedings, and the supervising member of the bar need not be present.

(3) He may prepare briefs, excerpts from record, abstracts, and other documents filed in courts of review of the State,

which may set forth the name of the student with the accompanying designation "Senior Law Student" but must be filed in the name of the supervising member of the bar." (Emphasis added.)

■■■ Although we know of no case on point, a clear reading of the above rule indicates that compliance has not been met here. The record fails to disclose any affirmative signal that either respondent or the trial judge was aware of Tinaglia's section 711 status. No written consent form by respondent appears in the record. Further, the trial judge's statements reflect that he thought that Tinaglia was an assistant public defender. The only instance where Michael Tinaglia's actual status appears, is on the face of the transcript of the February 15, 1977, proceeding. At the actual trial held on March 9-10, 1977, a different judge presided. We believe neither the judge nor respondent was aware that Tinaglia was not as yet, a licensed attorney.[1]

The facts of this case are distinguishable in two important respects from the recent case of *In re Boswell* (1978), ___ Ill. App. 3d ___, ___ N.E.2d ___. In *Boswell* our court held, in part, that it was permissible for an attorney to second chair a mental commitment hearing, while a respondent appears pro se. However, in that case, an attorney, and not a law student, second chaired the trial. Furthermore, there, unlike here, respondent himself insisted on having the court appoint an attorney to assist him. Therefore, the court found that respondent enjoyed "the best of both worlds: freedom to conduct his own defense and benefit from the assistance of counsel. (*People v. Heath* (1976), 35 Ill. App. 3d 880, 342 N.E.2d 452; *People v. Lindsey* (1974), 17 Ill. App. 3d 137, 308 N.E.2d 111.)" *In re Boswell* (1978), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___.

Because of the unique factual setting present here, we do not feel that this is an appropriate case in which to decide the other issues raised by respondent. Although we would ordinarily remand this cause for a new hearing, such a direction would be useless in the present situation since respondent has already been discharged from Madden. Therefore, due to the aforementioned reasons, we reverse and remand this cause with directions to vacate the judgment finding respondent in need of mental treatment and ordering the commitment.

Reversed and remanded with directions.

SULLIVAN, P. J., and MEJDA, J., concur.

---

[1] Our remarks should in no way be construed as impugning the competency of Mr. Tinaglia.